IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | |
|---|---|
| PORTERS NECK COUNTRY CLUB, INC., | Civil Action No. _____ |
| Plaintiff, | |
| vs. | **COMPLAINT AND JURY TRIAL DEMAND** |
| ALLIED WORLD ASSURANCE COMPANY (U.S.) INC., | |
| Defendant. | |

## COMPLAINT

Plaintiff Porters Neck Country Club, Inc. ("PNCC"), by its undersigned counsel, for its complaint against Defendant Allied World Assurance Company (U.S.) Inc. ("AWAC"), alleges as follows:

### NATURE OF THE ACTION

1.      This is an insurance coverage action in which Plaintiff PNCC, a country club, seeks various forms of relief under a first-party commercial property policy PNCC purchased from Defendant AWAC (the "Policy" or the "AWAC Policy"), based on AWAC's failure to honor its contractual obligations to PNCC under the AWAC Policy.

2.      In September 2018, PNCC's facility in Wilmington, North Carolina (the "Club") was in the direct path of Hurricane Florence's high-wind speeds and record-setting rainfalls.  Multiple structures at the Club were severely damaged, including the clubhouse, a 25,000 square foot building at the heart of the Club.

3.      The clubhouse suffered severe damage on its first and second floors, due to high winds that damaged the roof and windows on both floors, and wind-

1

driven rain that subsequently intruded into both floors through the damaged roof. The Club's maintenance office, pool bathroom/snack bar building, sports center, tennis courts and golf course also sustained damage.

4.      Days later, certain parts of the Club already fully damaged by Florence's wind and wind-driven rain were also subjected to flooding from an overflowed pond on the grounds of the Club.

5.      PNCC has worked to repair the Club as quickly as possible and has reopened certain areas, but there are still extensive repairs to be done, and AWAC has wrongfully and in bad faith refused to pay PNCC's claim. Based on AWAC's continuing refusal to pay, PNCC has taken on substantial debt to finance the repairs, but available funds are nearly exhausted and PNCC is in dire financial straits.

6.      To make matters worse, since the Club is only partially open, it continues to lack the revenue stream it typically earns from, among other things, hosting weddings and other paid events, operating a golf pro shop in the clubhouse, and operating a restaurant for members in the clubhouse. Even with parts of the Club reopened, PNCC still cannot secure the typical number of wedding and event bookings, and the Club has lost current and prospective members.

7.      During the months following Florence, PNCC's public adjuster submitted a steady stream of information to AWAC, eventually substantiating over $7.5 million in losses, of which at least $6 million is covered by the AWAC Policy (the "Claim"). AWAC paid $750,000 and refused to pay the remainder of the covered loss based in part on the Policy's flood exclusion, despite the Club having been fully and

completely damaged by wind and wind-driven rain days before any flooding occurred at certain structures.

8.      Shortly after the hurricane, AWAC's adjustment team advised PNCC that it must hire a loss mitigation company as soon as possible in order to comply with its loss mitigation obligations under the AWAC Policy. AWAC identified for PNCC a franchisee of the nationwide Servpro company called PRO Fire & Water Restoration d/b/a SERVPRO of Evergreen Park / South Chicago City ("Servpro"), a company with whom the adjustment team had a preexisting relationship.

9.      AWAC's adjustment team then facilitated Servpro contacting PNCC and repeatedly gave PNCC the impression that Servpro's costs would be covered by the Policy. PNCC, moving expeditiously at AWAC's instruction and believing Servpro's costs would all be covered, authorized Servpro to conduct the loss mitigation.

10.     Servpro, working under the instruction of AWAC's adjustment team, who had previously explained to PNCC that Servpro's costs were covered, ultimately charged PNCC directly for more than $1.4 million—a massively inflated figure well beyond what would be a reasonable fee for Servpro's scope of work. Despite PNCC advising AWAC of the Servpro invoice, and despite AWAC's previous representations to PNCC that Servpro's services were covered under the Policy, AWAC has not paid any portion of the invoice.

11.     Servpro subsequently placed a claim of lien on the Club for the full invoiced amount of $1,429,753.44 (the "Servpro Lien").

12.     AWAC knew from the beginning of the adjustment process and throughout the scope of Servpro's work that AWAC would deny coverage for part of the

3

Claim based on the Policy's flood exclusion. Nonetheless, AWAC authorized Servpro to remove and/or destroy all portions of the clubhouse and other structures that PNCC could have used to show that wind and rain, not flood, caused the damage PNCC is now in the process of repairing.

13. AWAC's legally and factually unsupported denial of coverage has forced PNCC, a non-profit corporation, into dire financial straits. PNCC took out a substantial line of credit to finance the repairs, but that line is nearly exhausted and PNCC will very likely be unable to secure additional financing.

14. In this action, PNCC seeks: (a) damages for breach of contract based on AWAC's failure to honor its obligations to PNCC under the AWAC Policy; (b) a judicial declaration that AWAC waived its right to assert, or is estopped from asserting, a flood exclusion in the Policy to deny or limit coverage, because a company directly supervised by AWAC, Servpro, destroyed the evidence necessary for PNCC to show that all damage to the Club was caused by wind and rain; and (c) a judicial declaration that AWAC must pay Servpro's full invoice and may only credit a reasonable portion of Servpro's repair invoice toward the exhaustion of the Policy's applicable limit(s) of liability.

15. PNCC also seeks treble damages under Chapter 75, Article 1, Section 75-1.1 of the North Carolina General Statutes for AWAC's unfair claim settlement practices in handling the Claim, as well as punitive damages under North Carolina common law.

### PARTIES

16. PNCC is a North Carolina non-profit corporation with its principal place of business at 8403 Vintage Club Drive, Wilmington, North Carolina 28411.

4

17.     Upon information and belief, Defendant Allied World Assurance Company (U.S.) Inc. is a Delaware corporation with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), because the amount in controversy is in excess of $75,000 and PNCC enjoys complete diversity of citizenship with AWAC.

19.     Venue is proper in this Court under 28 U.S.C. § 1391 because substantial parts of the events giving rise to the claims for relief pleaded herein occurred within the Eastern District of North Carolina.

## COMMON FACTS AND ALLEGATIONS

### PNCC Suffers Substantial Property Damage during Hurricane Florence and Files a Claim under the AWAC Policy

20.     On or about Friday, September 14, 2018, Hurricane Florence made landfall in and around Wilmington, North Carolina, where the Club is located.

21.     Florence's high wind speeds caused damage to the roof and multiple windows in the clubhouse.  The wind damage in turn led to severe water intrusion and resulting damage to both floors of the clubhouse and other parts of the Club, including the maintenance office, pool bathroom/snack bar building, sports center, tennis courts and golf course.

22.     On or about September 15, 2018, PNCC submitted a notice of loss to AWAC explaining the wind and rain damages to the Club and specifying that additional specifics about the scope of damage would be provided once PNCC could access the entire Club.

5

23.     On or about Sunday, September 16, 2018, after wind-driven rain already had inundated the clubhouse and other parts of the Club for two days, a pond at the Club overflowed because a backup gas-powered generator broke down based on water intrusion and was rendered unable to continue pumping excess rainfall out of the pond.

24.     After submitting its notice of loss, PNCC retained the public adjusting firm National Fire Association ("NFA").

25.     AWAC retained the services of the independent adjusting firm McLarens.

26.     AWAC, via Steven Korasidas, Executive General Adjuster for McLarens, advised PNCC of its time-sensitive loss mitigation responsibilities and identified an emergency damage mitigation and loss remediation company, Servpro, for PNCC's consideration.

27.     Servpro began its work at the Club on or about September 20, 2018 and continued through approximately October 13, 2018.

28.     AWAC retained as part of its adjustment team:  (a) McLarens; (b) Arya Claims Services ("Arya"), a claims management service for property insurance companies like AWAC; (c) Halliwell Engineering Associates ("Halliwell"), a cause and origin expert; and (c) DND Construction Services ("DND Construction"), a construction and property loss expert.  These four companies are collectively referred to herein as AWAC's "adjustment team."

29.     Having brought four separate companies on board within weeks of the hurricane, AWAC was fully equipped to promptly and fairly adjust and pay PNCC's claim.

30.     On October 4, 2018, AWAC's agent Arya sent a letter to PNCC reserving AWAC's right to deny coverage under the Policy's real property limit based on numerous terms in the Policy, including but not limited to an exclusion for "[l]oss caused by or resulting from … Flood."

31.     Around the time of and continuing after the October 4, 2018 letter, one of AWAC's loss adjusters made repeated statements to PNCC and/or its adjuster NFA agreeing that most or all of the loss should be covered.

32.     On or about October 25, 2018, an Arya representative visited the Club and, while there, advised Marc Tingle, Chief Operating Officer of PNCC, that AWAC would agree to make a $750,000 advance payment to PNCC, even though it was clear at that time that the covered loss would far exceed $750,000.

33.     PNCC received AWAC's $750,000 advance payment on or about November 1, 2018.

34.     PNCC requested additional partial payments after receiving the November 1, 2018 payment, but AWAC ignored all such requests, despite its adjustment team's statements that the loss would be covered.

35.     Despite AWAC's adjustment team continuing to give PNCC the impression that its losses were covered, on November 6, 2018, AWAC's agent Arya sent a second letter to PNCC reserving AWAC's right to deny coverage.  This time, AWAC appeared to also deny coverage for at least part of the Claim by stating that

7

"substantial damage to the Clubhouse resulted from flood, which cause of loss is excluded."

36. In November 2018, PNCC was forced to retain counsel to address AWAC's failure to pay and apparent denial based on the flood exclusion.

37. On November 19, 2018, PNCC sent a letter to AWAC that: (a) refuted AWAC's contention that any part of the damage to the clubhouse resulted from flood; (b) sought clarification on whether AWAC was actually denying coverage based on the flood exclusion; and (c) requested a detailed explanation with supporting documentation of what particular damage AWAC asserted was caused by flood.

38. On November 29, 2018, AWAC's agent Arya sent a letter to PNCC that: (a) acknowledged that one source of damage to the clubhouse was wind-driven rain; (b) asserted that the clubhouse was also damaged by overflow from a pond near the clubhouse; and (c) asserted that damage to other structures including the tennis courts, pool house and golf course may have resulted from flood. The letter did not provide the supporting documentation requested in PNCC's November 19, 2018 letter.

39. Throughout the timeframe in which this correspondence was being exchanged, PNCC's adjuster NFA and AWAC's adjuster McLarens spoke regularly about, and Mr. Korasidas of McLarens regularly agreed, that the Claim, or at least a very substantial portion of it, should be covered.

40. Having received only the November 1, 2018 advance payment of $750,000, NFA continuously requested additional partial payments and advised the adjustment team that AWAC's continuing failure to make more payments was pushing PNCC into more and more dire financial straits.

8

41.     AWAC ignored every one of PNCC's requests for additional partial payments during this timeframe.

42.     By letter dated December 7, 2018, PNCC again explained to AWAC's adjustment team that any infiltration of flood water into the clubhouse occurred after the relevant areas had been completely damaged by wind-driven rain, again requested an additional payment, and again advised AWAC that its failure to pay was pushing PNCC into an increasingly dire financial condition.

43.     On or about December 20, 2018, PNCC provided AWAC with invoices and estimates supporting a loss of $6,307,342.47, a substantial portion of which is covered under the Policy, and yet again requested that AWAC make at least an interim additional payment.

44.     Without explanation, AWAC did not make any payment based on PNCC's December 20, 2018 submission; instead, AWAC's counsel sent a January 2, 2019 letter disputing PNCC's position that the clubhouse was fully damaged by wind and rain prior to any flooding.

45.     In support of its position, AWAC provided two aerial photographs that purported to show flooding reaching the clubhouse, but did not explain how that documentation proved the flooding was the actual cause of damage.  The only other support offered by AWAC was a reference to "verbal reports" from its cause and origin expert.

46.     In early January 2019, PNCC provided additional documentation to support over $300,000 in business personal property damage and made additional requests for interim payments from AWAC to help finance the ongoing repairs.

9

47.     AWAC yet again ignored the requests, pushing PNCC into even more dire financial straits as it attempted to continue repairing the Club.

48.     On February 15, 2019, PNCC sent another letter to AWAC reminding AWAC of the December 20, 2018 and early January 2019 claim submissions substantiating millions of dollars of covered loss, and reiterating the dire financial condition PNCC was in as a result of AWAC not making any payments to finance the costs of ongoing repairs other than the initial $750,000 advance.

49.     After PNCC's February 15, 2019 letter, PNCC continued to urge AWAC to make payments and AWAC's adjustment team continued to agree that at least a substantial part of PNCC's losses would be covered.  Still, AWAC did nothing.

50.     In addition to AWAC's failure to finance the ongoing repairs themselves, the pace of the repairs continues to cause PNCC to lose substantial business income, for which PNCC has provided documentation and seeks coverage under the Policy.  PNCC's lost revenue includes but is not limited to:  (a) cancellation of weddings planned between September 2018 and December 2018; (b) loss of income from holiday parties based on having to hire outside catering based on lack of functioning kitchens at the Club; (c) loss of revenue from the Club's golf pro shop; (d) inability to schedule weddings and other paid events during winter 2019 and continuing through the date of this filing; (e) loss of revenue based on damage to and closure of the clubhouse restaurant; and (f) loss of prospective members.

**The AWAC Policy**

51.     AWAC sold PNCC Commercial Property Policy No. 5121-0110-04 for the policy period October 18, 2017 through October 18, 2018.  A copy of the Policy certified by AWAC as true and correct is filed herewith as Exhibit A.

52.     The AWAC Policy "insures against all risks of direct physical loss of or damage to property described herein …" occurring during the policy period, subject to various sublimits of liability, deductibles, exclusions, and other terms and conditions. *See* Ex. A at § 9 (p. 15 of 25).

53.     As relevant here, the Policy provides the following limits of insurance:

    i. $7,232,800 per occurrence for Real & Personal Property as defined in the Policy;[1]

    ii. $1,000,000 for Golf Holes as defined in the Policy;

    iii. $500,000 for Golf Course Property as defined in the Policy, including Debris Removal;

    iv. $200,000 for Trees & Landscaping as defined in the Policy, including Debris Removal; and

    v. $750,000 for Business Interruption and Extra Expense.

*See* Ex. A at Declarations, Item 3 (p. 1 of 25).

54.     The Policy includes the following exclusionary language:

This policy does not insure against loss or damage caused directly or indirectly by …

L. [l]oss or damage caused by or resulting from:

…

(2) "Flood," unless specified in ITEM 3. of the Declarations, and then only for such specified amount; or

(3) Any and all loss from any other cause when occurring concurrently or sequentially with … "Flood" …

*See* Ex. A at § 10.L.2-3 (pp. 16-17 of 25).

---

[1] Capitalized terms are defined in the AWAC Policy.

55.     Item 3 of the Declarations does not include a limit of liability for "Flood."

56.     For purposes of the Policy, "Flood" is defined as:

'Surface Water', waves, tide, or tidal water and the rising (including overflowing or breaking of boundaries) of lakes, ponds, reservoirs, rivers, streams, harbors and similar bodies of water …

*See* Ex. A at § 12 (p. 21 of 25).

57.     Real and personal property covered by the Policy is valued "at replacement cost without deduction for depreciation," unless "the property is not repaired or replaced within a reasonable period from the date of loss," in which case "the valuation is to be on an Actual Cash Value basis measured at the time of loss." *See* Ex. A at § 11.A (p. 19 of 25).

58.     The Policy's business interruption limit of liability provides coverage for:

loss resulting from necessary interruption of business conducted by the Insured and caused by direct physical loss or damage by any of the perils covered herein during the terms of this policy to Real and/or Personal Property as covered herein.

If such loss occurs during the term of this policy, it shall be adjusted on the basis of the actual loss sustained by the Insured, during the period of restoration, consisting of the net profit (or loss) which is thereby prevented from being earned and of all charges and expenses (excluding ordinary payroll), but only to the extent that they must necessarily continue during the interruption of business, and only to the extent to which they would have been incurred had no loss occurred.

*See* Ex. A at § 7.E (p. 8 of 25).

59.     For purposes of the business interruption coverage, Period of Restoration means:

the period of time that:  (a) Begins with the date of direct physical

loss or damage by any of the perils covered herein, at the described premises; and (b) Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

*See* Ex. A at § H.1 (p. 9 of 25).

60.     The Policy's business interruption limit of liability includes coverage for Expense to Reduce Loss, which includes:

such expenses as are necessarily incurred for the purpose of reducing any 'Business Interruption' loss under this policy, provided such coverage shall not exceed the amount by which the 'Business Interruption' loss covered under this policy is thereby reduced.

*See* Ex. A at § E.2 (p. 8 of 25).

61.     The Policy also includes coverage for Extra Expense, which includes:

the excess cost necessarily incurred to continue the operations of the Insured's business or facility that would not have been incurred had there been no loss or damage by any of the perils covered herein during the term of this policy to Real and/or Personal Property as covered herein.

*See* Ex. A at § F (p. 9 of 25).

62.     The Policy requires that AWAC pay all adjusted claims within 30 days "after the presentation and acceptance of satisfactory proof(s) of loss." *See* Ex. A at § 25 (p. 22 of 25).

**AWAC Fails to Pay Servpro's Exorbitant Fee and Stands By as Servpro Places a Claim of Lien on the Club**

63.     Mr. Korasidas of McLarens, the independent adjuster appointed by AWAC, made clear in the early days after the hurricane that the claim, including any charges from Servpro for its loss mitigation services, should be covered under the Policy.

13

64. On or about September 23, 2018, with the understanding that all Servpro invoices would be covered under the Policy and paid by AWAC, PNCC contracted with Servpro to provide loss mitigation and remediation services for the Club.

65. PNCC had no involvement in the identification of Servpro as a potential loss mitigation company or the delineation of Servpro's scope of work, and merely signed the agreement authorizing Servpro to perform services at the Club.

66. Servpro worked under the express supervision of AWAC's adjustment team throughout their time at the Club, and PNCC had no substantive involvement in authorizing Servpro's scope of work and no understanding of how Servpro was calculating how much to invoice for its services.

67. Given AWAC's adjustment team's repeated representations that Servpro's services would be paid by AWAC in full under the Policy, and given PNCC's comparative lack of familiarity with the loss mitigation and remediation business, PNCC did not closely supervise Servpro's work.

68. Servpro allegedly completed its scope of work on October 13, 2018 and departed from the Club.

69. Servpro departed the Club over one week sooner than it had previously told PNCC it would; upon information and belief, Servpro accelerated its departure because Hurricane Michael had made landfall in Florida and Servpro wished to move its personnel to another job.

70. On November 2, 2018, PNCC received an "Initial Draw Request" from Servpro in the amount of $500,000 for its work on the Club. The invoice included no breakdown for why Servpro was seeking such an enormous draw for the amount of

work it performed at the Club, and no explanation for why Servpro was seeking payment from PNCC rather than AWAC.

71.    On or about November 13, 2018, NFA requested various information from Servpro in an effort to evaluate Servpro's "Initial Draw Request."

72.    On November 15, 2018, Servpro issued a total invoice of $1,429,753.44.   The November 15, 2018 invoice included an uncertified listing of Servpro's employees' rates and time at the site as well as certain information about material and equipment rates.

73.    On December 5, 2018, having received none of the requested additional information from Servpro, NFA sent a letter to Servpro reiterating the prior request for information to evaluate the basis for Servpro's invoice.   Upon information and belief, Servpro never responded to the December 5, 2018 letter.

74.    On or about January 24, 2019, Servpro filed the Servpro Lien on the Club, further complicating PNCC's efforts to secure the financing necessary to repair the Club in the absence of any payments from AWAC.

75.    Despite having always explained to PNCC that the Servpro fees would be covered and despite having express knowledge of the Servpro Lien currently burdening the Club, AWAC has not paid the Servpro invoice or in any other way worked to alleviate the ongoing financial strain on PNCC from the Servpro Lien.

**The Servpro Agreement**

76.    The Servpro Agreement, a true and correct copy of which is attached hereto as Exhibit B, includes a one page "Authorization to Perform Services and Direction of Payment" signed by PNCC and Servpro.

15

77.     The Authorization to Perform Services and Direction of Payment component of the Servpro Agreement, signed by Marc Tingle of PNCC, states that PNCC "authorizes [Servpro] to perform any and all necessary cleaning and/or restoration services on [PNCC's] property … and with respect to items that need to be cleaned at a remote location to remove and clean such items as necessary." *See* Ex. B at p. 1.

78.     However, the Authorization to Perform Services and Direction of Payment does not contractually obligate PNCC to pay Servpro.  Instead, it includes the following provision enabling a customer to authorize its property insurance company to pay Servpro directly:

> Customer authorizes _____ Insurance Company, herein referred to as 'Insurance Company,' to pay Provider solely and directly for that portion of the work covered by Customer's Insurance policy.

*See* Ex. B at p. 1.

79.     PNCC and Servpro left the space before "Insurance Company" blank when executing the Servpro Agreement.

80.     The Authorization to Perform Services and Direction of Payment then establishes which entity will be responsible for which component(s) of the payment to Servpro:

> Customer agrees to pay Customer's deductible in the amount of $_____ that applies to this claim.  If any amounts owing to Provider for Provider services are not covered by insurance, Customer agrees to pay those amounts to Provider within fifteen (15) days of Customer's receipt of invoice.

*See* Ex. B at p. 1.

81.     PNCC and Servpro left the space for PNCC's insurance deductible blank when executing the Authorization to Perform Services and Direction of Payment.

16

## COUNT I – BREACH OF CONTRACT

82.    PNCC repeats and re-alleges the allegations of the foregoing paragraphs as if fully set forth herein.

83.    The AWAC Policy constitutes a valid contract of insurance between PNCC and AWAC, the terms and conditions of which were triggered by the damages suffered by PNCC's Club during Hurricane Florence.

84.    PNCC has performed all of its duties consistent with the terms and conditions of the AWAC Policy.

85.    All insurance premiums under the AWAC Policy have been paid and thus PNCC is rightfully entitled to the coverage benefits of the AWAC Policy.

86.    AWAC has refused to cover any of the covered property damage PNCC's Club suffered as a result of Hurricane Florence, all of which has been properly substantiated through submissions to AWAC by PNCC, other than AWAC's unallocated advance payment of $750,000.

87.    AWAC's refusal to provide coverage under the Policy includes, among other amounts, failure to reimburse amounts:  (a) already paid by PNCC to restore the Club; (b) that PNCC anticipates paying in the future to restore the Club back to its condition prior to the loss; and (c) charged to PNCC by Servpro based on the unreasonable scope of work undertaken by Servpro under the supervision of AWAC's adjustment team.

88.    As a result of AWAC's breach of contract, PNCC has sustained and will continue to sustain covered losses of at least $6 million, the final amount of which will be ascertained at trial.

17

## COUNT II – DECLARATORY JUDGMENT (WAIVER/ESTOPPEL)

89.     PNCC repeats and re-alleges the allegations of the foregoing paragraphs as if fully set forth herein.

90.     Via written correspondence from its agents, AWAC has reserved its right to deny coverage for part or all of PNCC's Claim based on the flood exclusion in the AWAC Policy.

91.     AWAC and its adjustment team knew at the time of Servpro's work at the Club that AWAC planned to deny coverage for part or all of PNCC's Claim on the basis that the damage was caused by floodwater infiltration.

92.     During that time period, AWAC instructed and permitted Servpro to remove various parts of the clubhouse with which PNCC could have proven that all damage to the Club occurred because of wind and rain prior to any infiltration of flood waters.

93.     Before Servpro completed its work, via the October 4, 2018 letter from Arya to PNCC, AWAC specifically reserved the right to deny coverage for part or all of PNCC's Claim based on the Policy's flood exclusion.  AWAC has since denied coverage for at least some portion of the Claim and continues to reserve its right to deny coverage in full.

94.     Despite AWAC already knowing it would deny coverage to PNCC on the basis of the flood exclusion, AWAC instructed Servpro to remove the parts of the clubhouse that PNCC would have used to demonstrate that the flood exclusion does not apply to PNCC's loss.

95.     Nonetheless, AWAC continues to assert that the flood exclusion does apply to the Claim.

96.     By reason of the foregoing, an actual and justiciable controversy exists between PNCC and AWAC with respect to whether AWAC can apply the flood exclusion to deny coverage for any part of PNCC's Claim in light of Servpro's removal of all factual evidence necessary to support AWAC's position.

97.     Accordingly, PNCC seeks a judicial declaration from this Court that AWAC has waived or is estopped from asserting the flood exclusion in its Policy as a basis to deny all of part of PNCC's Claim (*see* Ex. A at § 10.L.2-3 (pp. 16-17 of 25)).

## COUNT III – DECLARATORY JUDGMENT (SERVPRO PAYMENT)

98.     PNCC repeats and re-alleges the allegations of the foregoing paragraphs as if fully set forth herein.

99.     Though the Servpro Agreement was signed by PNCC and Servpro, Servpro was expressly instructed and supervised by AWAC's adjustment team during their work at the Club.

100.    PNCC was repeatedly led by AWAC's adjustment team to believe that Servpro's services would be covered in full under the Policy, and accordingly PNCC did not closely supervise Servpro's work or monitor the costs being incurred by Servpro.

101.    Under AWAC's adjustment team's supervision, Servpro invoiced an extremely unreasonable amount for the work it performed and then sent its invoice directly to PNCC despite AWAC's earlier representations that Servpro's invoices would be covered under the AWAC Policy.

102.    The Servpro Agreement contemplates that PNCC's insurance company will pay for Servpro's invoices and that PNCC is only potentially obligated to pay for whatever portion of the invoice is not paid by PNCC's insurance company.

103. Although AWAC has never actually stated that the Servpro charges are not covered under the Policy, AWAC has failed to pay any portion of Servpro's $1,429,753.44 invoice.

104. Upon information and belief, in the event that Servpro does agree that the Servpro charges are covered under the Policy, AWAC will attempt to credit all $1,429,753.44 toward the exhaustion of applicable limits of liability under the Policy, rather than only crediting that percentage of the Servpro invoice that corresponds with a reasonable fee for the amount of work performed.

105. By reason of the foregoing, an actual and justiciable controversy exists between PNCC and AWAC with respect to whether AWAC is legally obligated to pay the $1,429,753.44 Servpro invoice and with respect to the amount of such payment that AWAC can credit toward exhaustion of applicable limits of liability under the AWAC Policy.

106. Accordingly, PNCC seeks a judicial declaration from this Court that AWAC must pay the entirety of the Servpro invoice and may only credit that percentage of the invoice that corresponds with a reasonable fee for the amount of work performed toward exhaustion of applicable limits of liability under the AWAC Policy.

## COUNT IV – N.C. GEN. STAT. § 75-1.1(a)

107. PNCC repeats and re-alleges the allegations of the foregoing paragraphs as if fully set forth herein.

108. Chapter 75, Article 1, Section 75-1.1(a) of the North Carolina General Statutes declares unlawful all "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive practices in or affecting commerce …."

109. AWAC has engaged in unfair or deceptive practices violating

Section 75-1.1(a) by engaging in unfair claim settlement practices as delineated in Chapter 58, Article 63, Section 58-63-15, including by:

i. Failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of the Claim, by (a) inducing PNCC to discard near-new furniture that could have been reused based on PNCC's understanding that the furniture would be a covered loss under the Policy, (b) allowing loss mitigation company Servpro to remove and destroy parts of the Club PNCC could have used to prove that the Policy's flood exclusion is inapplicable, despite knowing that it would seek to deny coverage based on the flood exclusion, and (c) failing to provide requested documentation to support the factual basis for AWAC's coverage position;

ii. Refusing to make timely payment of the Claim on the purported basis that the Claim may be partly or wholly excluded based on a flood exclusion without conducting a reasonable investigation based on all available information of whether the damage was in fact caused by flood;

iii. Compelling PNCC to institute this litigation by paying only $750,000, an amount far less than what will ultimately be recovered by PNCC based on its covered and fully substantiated loss of at least $6 million;

iv. Making an advance payment of $750,000 to PNCC without stating the particular coverage under which AWAC was crediting the payment; and

v. Failing to act reasonably promptly to pay part or all of PNCC's Claim upon receipt of written substantiation of the damages comprising the Claim, despite repeated, urgent requests for payment based on the dire financial condition of the Club and its lack of funds to complete the repair process.

110. AWAC's acts, including but not limited to those listed above, were in or affecting commerce and were the direct and proximate cause of damage to PNCC, in the form of AWAC's failure to make timely payment of PNCC's Claim according to AWAC's obligations under the Policy.

111. AWAC's acts, including but not limited to those listed above, may be the direct and proximate cause of additional consequential damage to PNCC flowing

from AWAC's original failure to timely pay the Claim.

112.    PNCC is therefore entitled to recover treble damages and its reasonable attorneys' fees and expenses under N.C. Gen. Stat. §§ 75-16 and 75-16.1.

## COUNT V – COMMON LAW BAD FAITH

113.    PNCC repeats and re-alleges the allegations of the foregoing paragraphs as if fully set forth herein.

114.    AWAC, in its handling of PNCC's Claim, has acted willfully and wantonly, showing a conscious and intentional disregard of and indifference to PNCC's rights to be promptly and fully compensated for any loss covered under the Policy subject to other applicable terms and conditions.

115.    AWAC has acted willfully and wantonly in its handling of PNCC's Claim, including by:

i. Inducing PNCC to discard near-new furniture that could have been reused based on PNCC's understanding that the furniture would be a covered loss under the Policy, with knowledge that AWAC would assert that such loss was not covered based on a policy exclusion for flood;

ii. Allowing loss mitigation company Servpro to remove and destroy parts of the Club PNCC could have used to prove that the Policy's flood exclusion is inapplicable, despite knowing that it would seek to deny coverage based on the flood exclusion;

iii. Failing to provide requested documentation to support the factual basis for AWAC's coverage position despite repeated requests;

iv. Paying only a $750,000 advance payment, despite PNCC substantiating a covered loss of at least $6 million, with full knowledge that its failure to pay was placing PNCC in an increasingly dire financial condition as it attempted to complete repairs to the Club; and

v. Failing to act reasonably promptly to pay part or all of PNCC's Claim upon receipt of written substantiation of the damages comprising the Claim, despite repeated, urgent requests for payment based on the dire financial condition of the Club and its lack of funds to complete the

repair process.

116.   Upon information and belief, AWAC knew or should have known that its conscious and intentional disregard of and indifference to PNCC's rights was reasonably likely to result in injury to PNCC.

117.   By reason of AWAC's bad faith conduct, PNCC is entitled to recover all of its damages, including all incidental, consequential and compensable damages, along with pre-judgment and post-judgment interest, reasonable attorneys' fees and expenses, and punitive damages in amounts to be determined at trial and as permitted under North Carolina law.

## PRAYER FOR RELIEF

WHEREFORE, PNCC requests that this Court:

1.   Enter judgment on Count I in favor of PNCC and against AWAC for damages in an amount to be determined at trial, including compensatory damages, consequential damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, and such other relief as this Court may deem appropriate;

2.   Enter a judicial declaration on Count II that AWAC has waived or is estopped from asserting the AWAC Policy's flood exclusion to deny PNCC's Claim in whole or in part;

3.   Enter a judicial declaration on Count III that AWAC must pay the entire amount of Servpro's invoice and may only credit that percentage of the invoice that corresponds with a reasonable fee for the scope of work performed toward exhaustion of applicable limits of liability under the AWAC Policy;

4.   Enter judgment on Count IV in favor of PNCC and against AWAC for damages in an amount to be trebled and for reasonable attorneys' fees and

23

expenses pursuant to North Carolina General Statutes Chapter 75, Article 1, Sections 75-1.1(a), 75-16 and 75-16.1;

5.    Enter judgment on Count V in favor of PNCC and against AWAC and award damages, including all incidental, consequential and compensable damages, plus punitive damages in the maximum amount permissible under North Carolina law and recovery of reasonable attorneys' fees and expenses; and

6.    On all Counts, award such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

PNCC hereby demands trial by jury of any and all issues so triable.

This the 20th day of March, 2019.

/s/ Alex C. Dale
Alexander C. Dale
N.C. State Bar I.D. No. 28191
Email:  acd@wardandsmith.com
Michael J. Parrish
N.C. State Bar I.D. No. 38419
Email:  mjp@wardandsmith.com
For the firm of
Ward and Smith, P.A.
127 Racine Drive
Wilmington, North Carolina  28403
Telephone:  (910) 794-4800
Facsimile:  (910) 794-4877
*Local Rule 83.1 Counsel for Plaintiff Porters Neck Country Club, Inc.*

Finley T. Harckham, Esq. *(Notice of Special Appearance forthcoming)*
Nicholas R. Maxwell, Esq. *(Notice of Special Appearance forthcoming)*
ANDERSON KILL P.C.
1251 Avenue of the Americas
New York, New York  10020
Telephone:  (212) 278-1000
fharckham@andersonkill.com
nmaxwell@andersonkill.com

*Attorneys for Plaintiff*
*Porters Neck Country Club, Inc.*

ND: 4843-2347-5594, v. 3